**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CIVIL ACTION**

**J.B. HARRIS,**

      **Plaintiff Pro Se,**

v.                        **CASE NO: 08-20703-CIV-DIMITROULEAS**

**UNITED AUTOMOBILE INSURANCE**        **JURY DEMAND**
**GROUP, INC., a Florida corporation,**
**and CERIDIAN CORP., a foreign corporation,**

      **Defendants.**
_____/

**SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

      **COMES NOW**, J.B. HARRIS ("HARRIS"), Plaintiff pro se, pursuant to the Federal

Rules of Civil Procedure and 29 U.S.C. § 1132(a)(1)(B) and (3)(B)(i) and (ii),[1] hereby files this

---

[1] 29 U.S.C.A. § 1132 states in part:

(a) Persons empowered to bring a civil action

A civil action may be brought--

    (1) by a participant or beneficiary--

        (A) for the relief provided for in subsection (c) of this section, or

        (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

    (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

    (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . (emphasis added).

**EXHIBIT "1"**

Second Amended Complaint against Defendants, UNITED AUTOMOBILE INSURANCE GROUP, INC. ("UAIG"), a Florida corporation, and CERIDIAN CORP. ("CERIDIAN"), a foreign corporation, claiming Recovery of Benefits (COUNT I); Breach of Contract (COUNT II) and Violation of 24 CFR § 26 CFR § 54.4980B-8 (COUNT III), and in support thereof states: [2]

## JURISDICTION AND VENUE

1.      The court has jurisdiction pursuant to 28 U.S.C.A. § 1331, in that the matter in controversy is governed by Title 29, Chapter 18 of the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. § 1001 *et seq.* (ERISA), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985, Subchapter I, Subpart B, Part 6, of the United States Code Annotated ("COBRA "), 29 U.S.C.A. § 1161 *et seq.*  The court also has supplemental jurisdiction pursuant 28 U.S.C. § 1367.

2.      Venue is proper because HARRIS is a resident of this District and the injuries complained of arose in this District.

3.      HARRIS has exhausted all administrative remedies prior to bringing this action.

## PARTIES

4.      HARRIS is a Florida attorney who has been a member in good standing with the Florida Bar since 1985 and who is authorized to practice before this court.  He was formerly employed by UAIG as its in-house counsel for approximately 66 days in 2007.

5.      UAIG is a Florida corporation headquartered in this District.  Its primary business is selling minimum limits personal injury protection automobile insurance (PIP), through one or more of its subsidiaries.

---

[2]   HARRIS' Amended Complaint simply corrected some typographical errors and made editorial corrections to properly cite certain statutory provisions referenced therein.  Otherwise, there was no substantive difference between the claims asserted in the initial Complaint and the Amended Complaint, as there is here.

6.      UAIG also is a Plan sponsor and administrator for a self-insured, self-funded health benefit plan for medical claims up to $125,000 per person, per year, with stop loss coverage provided by Connecticut General Life Insurance Company (the "Plan"). (See relevant pages attached hereto as Exhibit "1").

7.      CERIDIAN is a COBRA plan administrator employed by UAIG to processes COBRA premium payments for UAIG's former employees, who opt to enroll in COBRA following their termination of employment with UAIG.[3]

8.      In this capacity, CERIDIAN acts as UAIG's agent in complying with its COBRA obligations under 29 U.S.C.A. § 1132 *et seq.,* and therefore assumes all contractual and fiduciary obligations due a covered employee under the Plan.

9.      Headquartered in Bloomington, Minnesota, CERIDIAN has a regional office located in St. Petersburg, Florida.  As a qualified employee with UAIG, HARRIS opted to enroll in a CERIDIAN administered COBRA plan upon his termination of employment with UAIG in May 2007.

## ALLEGATIONS COMMON TO ALL COUNTS

10.     Prior to working for UAIG, HARRIS was employed for approximately three years with a law firm in Mt. Pleasant, South Carolina.

11.     Formerly a Miami attorney for more than 20 years before moving to South Carolina, HARRIS returned to Miami in January 2007.  However, his wife and three children -- ages 13, 11 and 8 -- remained behind because they were unable to sell their house.

---

[3]  CERIDIAN's status as Administrator is actually contradicted by the UAIG's Plan documents, as demonstrated below.

12.     Upon returning to Miami in 2007, HARRIS accepted employment with UAIG. His sole function was to assist UAIG in identifying attorney overbilling and prosecuting attorney fraud in fee applications on UAIG PIP claims.  In this capacity, HARRIS was located at a UAIG captive law firm located in Hialeah, Florida.

13.     While employed by UAIG, HARRIS and his family were enrolled in and covered by a "CIGNA Health Care Open Access Plus," preferred patient health insurance plan (PPO), for which HARRIS paid a portion of the premium from his bi-weekly salary.

14.     The Plan covered medical, dental and vision expenses for HARRIS, his wife and three children.

15.     HARRIS remained with UAIG for approximately 66 days, until the termination of his employment on or about May 11, 2007.

16.     Upon his termination, HARRIS elected to maintain continuing health insurance coverage through COBRA, as provided by UAIG and administered through CERIDIAN.

17.     The primary reason for wanting to enroll in the Plan was that the insurance provided thereunder covered both HARRIS and his family, even though they lived in separate states.

18.     Finding this type of multi-state coverage for a single family divided by economic realities beyond their control is nearly impossible and cost prohibitive.

19.     To facilitate timely enrollment in the Plan, HARRIS contacted Ms. Judy Neumann, the head of benefits at UAIG, who forwarded all relevant information to CERIDIAN.

20.     She assured HARRIS that he would be receiving a package of materials from CERIDIAN.  (See Exhibit "2").

21.     Sometime after May 22, 2007, CERIDIAN sent to HARRIS a letter stating: "We have been retained by [UAIG] to notify you of your group health care benefits continuation rights." (See Exhibit '3").

22.     According to the letter, enclosed therewith was an "Additional Information" sheet that "**fully explained**" HARRIS' rights under the Plan, even though it does nothing of the sort.

23.     Rather, the document is merely CERIDIAN's boilerplate protocol -- likely distributed to every covered employee regardless of who they've worked for -- and is not even aligned with the rights set forth under UAIG's Plan.

24.     Indeed, not only does CERIDIAN's (mis)information sheet contradict the very terms and conditions of the Plan itself, by among other things concealing the actual Administrator under the Plan -- which in truth is UAIG -- and by failing to disclose a covered employee's right to appeal denial of benefits thereunder, it also clearly states in Paragraph L, "**This notice does not fully describe continuation coverage or other rights under the Plan.**" (emphasis added).

25.     Unlike CERIDIAN's boilerplate, a Summary Plan Description ("SPD") is a legal document that sets forth the contractual rights and duties of the employer and covered employee under a given health benefit plan -- including all notices, plan cancellation provisions and rights to appeal pertaining thereto -- and is required by law to be given to an employee "within **90 days** after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits."   29 U.S.C.A. § 1024(b)(1)(A)(emphasis added).  *See Sunderlin, supra,* 235 F.Supp.2d 222 (pursuant to ERISA section allowing civil actions to enjoin acts or practices that violate ERISA, sponsor of long-term disability plan had to provide participant with completed

summary plan description (SPD) within certain number of days); *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279 (9th Cir. 1990), certiorari denied, 111 S.Ct. 964, 498 U.S. 1087, 112 L.Ed.2d 1051 (under ERISA, summary plan description must list and explain circumstances that may result in disqualification, ineligibility, or a denial of loss of benefit).[4]

26.    In this instance, UAIG's SPD, which also serves as its "Plan Document," first states:

> THIS IS NOT AN INSURED BENEFIT PLAN. THE BENEFITS DESCRIBED IN THIS BOOKLET OR ANY RIDER ATTACHED HERETO ARE SELF-INSURED BY UNITED AUTOMOBILE INSURANCE GROUP WHICH IS

---

[4]   As mandated by 29 U.S.C.A. § 1022:

**(a) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title.** The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title.

**(b) The summary plan description shall contain the following information:** The name and type of administration of the plan; in the case of a group health plan (as defined in section 1191b(a)(1) of this title), **whether a health insurance issuer (as defined in section 1191b(b)(2) of this title) is responsible for the financing or administration (including payment of claims) of the plan and (if so) the name and address of such issuer; the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator);** a description of the relevant provisions of any applicable collective bargaining agreement; the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; **circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided;** the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 1191b(a)(1) of this title) and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title). (emphasis added).

RESPONSIBLE FOR THEIR PAYMENT. CONNECTICUT
GENERAL PROVIDES CLAIMS ADMINISTRATION
SERVICES TO THE PALN, BUT CONNECTICUT GENERAL
DOES NOT INSURE THE BENEFITS DESCRIBED.

\* \* \*

THIS DOCUMENT MAY USE WORDS THAT DESCRIBE A
PLAN INSURED BY CONNECTICUT GENERAL. BECAUSE
THE PLAN IS NOT INSURED BY CONNECTICUT GENERAL,
ALL REFERENCES TO INSURANCE SHALL BE READ TO
INDICATE THAT THE PLAN IS SELF-INSURED. FOR
EXAMPLE, REFERENCES TO "CG," "INSURANCE
COMPANY," AND "POLICYHOLDER" SHALL BE DEEMED
TO MEAN YOUR "EMPLOYER" AND "POLICY" TO MEAN
"PLAN" AND "INSURED TO MEAN "COVERED" AND
"INSURANCE" SHALL BE DEEMED TO MEAN
"COVERAGE"

(Exhibit "1", p. 5)

27.     Next the SPD states that the "Plan Administrator" is in fact the "Employer named

above," *i.e.,* UAIG. *Id.,* p. 59, not CERIDIAN as its documents fraudulent misrepresent. (*See*

*also* Defendants' admission: "[A]n administrator (here, United Auto, not Cerdian)" [D.E. 49, p.

4]).[5]

28.     Moreover, "discretionary authority" is vested in the Plan Administrator:

. . . to interpret and apply plan terms and to make factual
determinations in connection with its review of claims under the
plan. Such discretionary authority is intended to include, but not
limited to, the determination of the eligibility of persons desiring to
enroll in or claim benefits under the plan, the **determination of
whether a person is entitled to benefits under the plan**, and the
computation of any and all benefit payments. **The Plan
Administrator also delegates to CG [UAIG] the discretionary
authority to perform a full and fair review, as required by
ERISA, of each claim denial which has been appealed by the**

---

[5]   The very fact that UAIG is both the Employer and the Administrator under the plan creates an inherent conflict of
interest.

> **claimant or his duly authorized representative**. (emphasis added). *Id.* p. 60.

29.     Accordingly, all appeals of denied claims are to be filed with UAIG. *Id.* p. 59.

30.     HARRIS commenced receiving COBRA benefits retroactive to his termination date in May 2007.  In the interim, neither CERIDIAN nor UAIG ever provided to HARRIS a copy of the SPD as required by 29 U.S.C.A. § 1022(a) and (b) and § 1024(b), respectively, until **<u>after</u>** HARRIS commenced this litigation.  Nor did UAIG ever provide to HARRIS an SPD while he was employed by UAIG.  Accordingly, both violated 29 U.S.C.A. § 1022.

31.     Public records indicate that CERIDIAN is a multi-national corporation headquartered in Minnesota, with operations in the United States, Canada and Europe.

32.     Once publicly traded, CERIDIAN is now privately held. Headed by President and CEO, Kathryn Marinello, CERIDIAN primarily provides human resource support to companies wanting to outsource their human resource operations, including the administration of post-employment COBRA plans.

33.     Despite its enormous size and sophistication -- and despite the fact that almost every other company in the world that sells goods and services -- including insurance companies and third-party administrators like CERIDIAN -- now allows its customers and clients to pay their bills over the Internet using debit, credit, check, Paypal and automatic draft transactions -- CERIDIAN imposes on COBRA qualified employees the undue burden of having to make their premium payments through the U.S. Mail.

34.     This archaic, inefficient, overly burdensome, time consuming and paper intensive requirement is a trap for the unwary.

35.     After signing a COBRA election form in May 2007, HARRIS began making his regular monthly premium payments to CERIDIAN in the amount of $1,162.13, in consideration for the COBRA benefits under the Plan. S*ee Geissal v. Moore Medical Corp.* 524 U.S. 74, 81 (U.S.1998)("The 'applicable premium' is usually the cost to the plan of providing continuation coverage, regardless of who usually pays for the insurance benefit.").

36.     Each month, CERIDIAN would send to HARRIS at his residence in South Carolina, via regular mail, invoices for the premiums due -- e-mail notices not being available. Upon receipt of said invoices, HARRIS' wife, Susan, dutifully opened each envelope, wrote a check and timely posted the return payment to CERIDIAN's CobraServe offices in St. Petersburg, FL.

37.     Susan inquired about paying the premiums over the Internet, or establishing up an automatic debit to the HARRIS' checking account, but representatives from CERIDIAN informed her this was impossible -- CERIDIAN only accepted payments by mail -- making its protocol an overly burdensome, non-negotiable adhesion contract.

38.     With three children who seem to demand constant medical attention -- two have severe asthma and allergies -- two suffer from learning disabilities requiring medication and counseling -- and all three are active in sports, skate boarding and roughhousing that have left them, on occasion, with cuts, bruises and broken bones requiring trips to the ER -- the HARRISES wisely, consistently and timely have made their COBRA premium payments through the U.S. Mail.  Indeed, with the health of so many lives at stake, the thought of doing otherwise was unthinkable.

39.     Sometime in January, Susan received CERIDIAN's invoice for coverage up to and including January 11, 2008. (See Exhibit "4").

40.     Allowing for a 30-day grace period to pay the premium, HARRIS was required to post a check to CERIDIAN's office in Florida on or before February 11, 2008.

41.     Susan made a check out to CERIDIAN dated February 8, 2008, which she placed in the mailbox in South Carolina on February 11, 2008.

42.     She either inadvertently did so after the mail carrier had made his rounds.  Or the envelope was picked up that day and post-marked a day later -- February 12, 2008 -- a real possibility in some areas of South Carolina -- like where Mrs. HARRIS lives -- because the postal service often employs part-time mail carriers, who use their own vehicles to deliver the mail, and the mail could have gotten delayed, misplaced or even left in the carrier's car overnight, before making its way to the post office the next day to be postmarked.

43.     Whatever the case, one James Trimble, CERIDIAN's chief compliance officer in Florida, informed HARRIS that because the envelope had a postmark bearing the date of February 12, 2008, it was one day late sufficient to terminate coverage.

44.     While HARRIS, as an attorney, truly appreciates the importance of a statute of limitations, the 30-day grace period allowable under 29 U.S.C.A. § 1162 (2)(C), is discretionary and flexible, not mandatory or jurisdictional, as statutes of limitations are ordinarily construed. *See Geissal v. Moore Medical Corp.* 524 U.S. 74, 81 (U.S.1998)("Benefits **may** [not shall] cease if the qualified beneficiary fails to pay the premiums, [under] § 1162(2)(C))(emphasis added).[6]

---

[6] 29 U.S.C.A. § 1162 (2)(C) defines "Failure to pay premium" as:

The date on which coverage ceases under the plan by reason of a failure to make timely payment of any premium required under the plan with respect to the qualified beneficiary. The payment of any premium (other than any

45.     More significantly, Title 29 makes no mention as to how payments are to be made.   And 26 CFR § 54, p.5170 clearly states, "The final [IRS] regulations [governing COBRA] also clarify that payment is considered made on the date it is **sent.**"   **Not postmarked**. Meaning placing it in the mailbox is clearly sufficient to meet IRS requirements. (emphasis added). *See, e.g., Custer v. Murphy Oil* USA, Inc., 2007 WL 2095814 (5th Cir.)(issue under mailbox rule was not whether plan document was actually received, but whether employer used measures reasonably calculated to ensure actual receipt).

46.     Further, 26 CFR § 54.4980B-8 Q/A-5 states:

What is timely payment made for COBRA continuation coverage?

**Payment that is made to the plan by a later date is also considered timely payment if** either  -- (1) Under the terms of the plan, covered employees or qualified beneficiaries are allowed until that later date to pay their coverage for the period; or (2) **under the terms of an arrangement between the employer or employee organization and an insurance company, health maintenance organization, or other entity that provides plan benefits on the employer's or employee's organization's behalf, the employer or employee organization is allowed until the later date to pay for coverage of similarly situated non-COBRA beneficiaries for the period.** (emphasis added).

47.     Upon information and belief, as self-insured, self-funded Plan Sponsor and Administrator, UAIG either pays claims when they come due, or funds a claims account at various intervals that exceed the time limit for paying premiums imposed on HARRIS by UAIG through its agent CERIDIAN in violation of  26 CFR § 54.4980B-8.

48.     Indeed, prior to the Plan's disclosure during the course of this litigation, HARRIS had no way of knowing who the true Administrator was; whether there existed a 30 day grace

---

payment referred to in the last sentence of paragraph (3)) shall be considered to be timely if made within 30 days after the date due **or within such longer period as applies to or under the plan**.)(emphasis added).

period under the Plan; or whether it allowed for some grace period beyond 30-days; or whether the Plan provides for means of payment other than by U.S. mail; or whether HARRIS is entitled to internal due process in the event of wrongful termination caused by inadvertence or excusable neglect; or what the "circumstances [are] which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided"; or who to serve process on; or any of the other numerous rights he is entitled to, and that UAIG and CERIDIAN failed to disclose to him, in violation of 29 U.S.C.A. § 1022(a) and (b).

49.    Accordingly, neither UAIG nor CERIDIAN could have legally terminated HARRIS' benefits under these circumstances, when they never even provided HARRIS with the SPD prior to his enrolling, thus placing him on notice of his rights thereunder, and where CERIDIAN's own documents are deceptive, misleading, non-conforming, ambiguous and contradictory.[7] *See Dobson v. Hartford Financial Services Group, Inc.,* 389 F.3d 386 (2nd Cir. 2004)(in action for benefits, courts have ability to supply implied terms to contracts governed by ERISA). *See also Mullaly v. First Reliance Standard Life Ins. Co*., 253 F.Supp.2d 279 (D. Conn. 2003)(ambiguities in ERISA plan that court is reviewing de novo are construed in favor of the plan beneficiary).

50.    Further, CERIDIAN's decision to unilaterally terminate HARRIS' coverage based on a day late postmark was arbitrary and capricious, especially where, as here, UAIG, as the true plan Administrator, had the discretion to reinstate his coverage. And where, as here,

---

[7]  Contrary to CERIDIAN's own documents, the SPD itself states, "Your COBRA continuation coverage will be provided for each coverage period as long as payment for the coverage period is made [**not postmarked**] before the end of the grace period for that payment."  (See Exhibit "1", p. 58).  Again, the mailbox rule would clearly govern in this instance, regardless of a postmark, otherwise envelopes lost in the mail would insure a covered employee's loss of benefits through no fault of their own, as similarly happened in the instant case.

CERIDIAN left HARRIS without recourse, remedy or appeal through any available channels at CERIDIAN or UAIG, even though the Plan clearly provides that right under its terms. *See Buckley v. Metropolitan Life,* 115 F.3d 936 (11th Cir.1997)("ERISA does not provide a standard to review decisions of a plan administrator or fiduciary. The Supreme Court has held that a range of standards may apply to benefits determinations under the statute. Accordingly, this court has adopted the following standards for reviewing administrators' plan interpretations: (1) *de novo* where the plan does not grant the administrator discretion, (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest"). (internal citations omitted); *Jett v. Blue Cross and Blue Shield of Alabama, Inc.* 890 F.2d 1137 (11th Cir. 1989)(same).

51.     *See also Washicheck v. The Ultimate Ltd.,* 231 F.R.D. 550 (W.D.Wis.2005)(genuine issue of fact, as to whether former employer and health plan had justification to terminate COBRA coverage for late payment, given statements in Consolidated Omnibus Budget Reconciliation Act (COBRA) notice suggesting that premium might be timely when submitted within 30 days of end of premium period, precluded summary judgment in favor of employer and health plan on ERISA claim for unpaid benefits and damages). *See also Mercek v. Northwest Airlines Corp.,* slip op., 2007 WL 4557153 (S.D.Fla.)(where covered employee under COBRA plan suffered cancellation of policy after automatic bank draft for premium payment was returned for insufficient funds did not on preclude her from suing for lost benefits sufficient to survive a motion to dismiss).

52.     Based on the February 12th postmark, on February 18th -- six days later -- CERIDIAN mailed to HARRIS a notice -- which he received on or about February 21st -- nine

days later -- that CERIDIAN had terminated his COBRA benefits retroactive to January 11, 2008, meaning all doctor visits from January 11, 2008, forward remain uncovered. (See Notice Exhibit "5").

53.     Upon receipt of said notice and the shocking realization that he and his family were left uncovered, HARRIS began calling everyone from the CERIDIAN's CEO, to UAIG's General Counsel, desperately seeking their assistance.

54.     At every turn, representatives at CERIDIAN informed HARRIS that resolution of the matter resided with UAIG, whereas UAIG, in response, informed HARRIS that CERIDIAN had the authority to reconsider the matter.

55.     After awhile, this back-and-forth became a classic case of "who's on first", or "the right hand not knowing what the left hand was doing." Whatever one calls it, HARRIS and his family had no health insurance coverage and no internal due process, while UAIG and CERIDIAN played hide the ball with the life, health and safety of HARRIS and his family. *See Rucker v. Pacific FM, Inc.*, 806 F.Supp.1453 (N.D. Cal.1992)(purpose of ERISA notification requirements for change in benefits is to protect interests of plan participants, and such goal is undermined when employers play "hide the ball" with employees).

56.     Over the course of a week, HARRIS left a dozen or more messages with Kathryn Marinello, desperately seeking her intervention, but never even received the courtesy of a call-back.

57.     However, in trying to reach Ms. Marinello, her assistant Sandy revealed to HARRIS CERIDIAN's little secret: that he and his family were not the only ones to have been caught in this trap.

58.     Sandy knew of other families who had had their COBRA benefits wrongfully terminated by CERIDIAN, because they had either moved to new locations, and the forwarding mail was late in delivering to them CERIDIAN's invoices, or payments were lost in the mail. Or, like in HARRIS' case, the mail was delayed in having envelopes postmarked and returned to CERIDIAN, which seems to happen frequently to people living in rural areas, according to Sandy.

59.     All of this of course could be avoided, Sandy admitted, if CERIDIAN would move into the 21st century, and allow covered employees to pay their premiums on-line, or through automatic debit, rather than forcing them to rely on an archaic, overly burdensome, time consuming and paper intensive method of making premium payments through the mail.

60.     After this exchange, HARRIS was then bounced back to UAIG, where HARRIS left 4 or 5 urgent messages with its General Counsel, Charles Grimsley, who also refused to show HARRIS the courtesy of a return call, even though HARRIS is an attorney and former counsel for UAIG.

61.     Instead, HARRIS received an e-mail from Grimsley informing him that "I do not have any decision making authority in this matter." (See Exhibit "6").

62.     While waiting for Grimsley to return his calls, HARRIS went back to Sandy, who told him to call CERIDIAN's Linda Jandernal in Florida, who in turn told him she would hand the matter over to her compliance department, which would get back to HARRIS later that day.

63.     When the call never came, HARRIS got Jandernal back on the line, who put him in touch with a compliance officer named Sandy (not Marinello's assistant).

64.     This Sandy told HARRIS she could do nothing to assist him, because this was UAIG's problem.  Thereafter the matter was referred up the chain to Trimble.

65.     After a week's worth of trying, Trimble informed HARRIS that a postage stamp marked a day late constituted a "qualifying event" under the Plan, resulting in the draconian and irrevocable termination of HARRIS benefits, without any due process right of appeal, remedy, recourse or reinstatement.[8]

66.     All of this despite the fact that HARRIS (i) had no idea whether the Plan defines "qualifying event" as a day late postmark, because he never got the SPD; and (ii) HARRIS manifest every intention of paying his premium, as evidenced by a check dated February 8, 2008 -- **which CERIDIAN held for weeks before returning** -- together with an envelope postmarked a day late by the South Carolina postal service, which HARRIS has yet to see.

---

[8]   Trimble must have been confused because both CERIDIAN's "Additional Information" sheet and 29 U.S.C.A. § 1163 define "qualifying event" as something other than a late postmark, to wit:

 . . . with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary:

        (1)   The death of the covered employee.

        (2)   The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

        (3)   The divorce or legal separation of the covered employee from the employee's spouse.

        (4)   The covered employee becoming entitled to benefits under title XVIII of the Social Security Act [42 U.S.C.A. § 1395 *et seq.*].

        (5)   A dependent child ceasing to be a dependent child under the generally applicable requirements of the plan.

        (6)    A proceeding in a case under Title 11, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.

In the case of an event described in paragraph (6), a loss of coverage includes a substantial elimination of coverage with respect to a qualified beneficiary described in section 1167(3)(C) of this title within one year before or after the date of commencement of the proceeding.

67.     Trimble then informed HARRIS that UAIG could reverse the decision, but that CERIDIAN had no discretion in the matter.

68.     Accordingly, HARRIS contacted Grimsley via e-mail seeking his assistance, who, without giving any reason or justification, merely informed HARRIS that the decision would stand, thus denying HARRIS of his rights to an appeal as guaranteed under the Plan. (See Exhibit "7").

### COUNT I

### RECOVERY OF BENEFITS AGAINST UAIG PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

69.     Plaintiff realleges and restates each and every allegation set forth in paragraphs 1 though 68 above as if fully set forth herein.

70.     Defendant UAIG wrongfully deprived HARRIS or his COBRA benefits by allowing its agent CERIDIAN to terminate his coverage without cause and without the right to appeal, contrary to the terms and conditions set forth in the Plan document.

71.     UAIG also mislead HARRIS into thinking CERIDIAN was the true Administrator vested with the authority to do so, when in fact UAIG had the discretion to review HARRIS' entitlement to benefits and wrongful denial thereof.

72.     UAIG violated the terms of the Plan by refusing to reinstate HARRIS' benefits.

73.     HARRIS brings this action to recover his benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

WHEREFORE, Plaintiff demands this Honorable Court enter a judgment against UAIG for reinstatement of his benefits, including all unpaid medical expenses, out-of-pocket expenses, economic damages and continued coverage until expiration of the plan, or just

compensation in lieu thereof, together with attorneys fees and costs, and all other damages this court deems fair and just.

## COUNT II

### BREACH OF CONTRACT AGAINST UAIG AND CERIDIAN

74.      Plaintiff realleges and restates each and every allegation set forth in paragraphs 1 though 68 above as if fully set forth herein.

75.      Defendants violated the law by failing to supply to HARRIS a SPD within 90 days of coverage as required by 29 U.S.C.A. § 1022(a) and (b).

76.      Further, Defendants are bound by contract to provide HARRIS with COBRA coverage without interruption for the statutory minimum coverage of 18 months.

77.      Defendants breached this agreement by unilaterally terminating HARRIS' COBRA benefits without cause.

78.      As a result of said breach, HARRIS has been damaged.

WHEREFORE, Plaintiff demands this Honorable Court enter a judgment against defendants for any and all contractual, economic, out-of-pocket, compensatory, consequential and statutory damages allowable by law, including without limitation, attorney's fees and costs, together with all other damages this court deems fair and just.

## COUNT III

### VIOLATION OF 26 CFR § 54.4980B-8 AGAINST UAIG AND CERIDIAN

79.      Plaintiff realleges and restates each and every allegation set forth in paragraphs 1 though 68 above as if fully set forth herein.

18

80.      26 CFR § 54.4980B-8 states:

> Payment that is made to the plan by a later date is also considered timely payment if either   -- (1) Under the terms of the plan, covered employees or qualified beneficiaries are allowed until that later date to pay their coverage for the period; or (2) under the terms of an arrangement between the employer or employee organization and an insurance company, health maintenance organization, or other entity that provides plan benefits on the employer's or employee's organization's behalf, the employer or employee organization is allowed until the later date to pay for coverage of similarly situated non-COBRA beneficiaries for the period.

81.      Upon information and belief, as a self-insured, self-funded Plan Sponsor and Administrator, UAIG either pays claims when they come due, or funds a claims account at various intervals that exceed the time limit for paying premiums imposed on HARRIS by UAIG through its agent CERIDIAN in violation of  26 CFR § 54.4980B-8.

82.      Under 29 U.S.C. § 1132(a)(1)(B) and (3)(B)(i) and (ii), HARRIS has the right to seeks money damages, reinstatement of benefits and other equitable relief to avoid UAIG continued violations of the Plan, including enforcement of  26 CFR § 54.4980B-8.

WHEREFORE, Plaintiff demands this Honorable Court enter a judgment against defendants for any and all contractual, economic, out-of-pocket, compensatory, consequential and statutory damages allowable by law, including without limitation, attorney's fees and costs, as well as the equitable enforcement of 26 CFR § 54.4980B-8 in HARRIS' favor, together with all other damages this court deems fair and just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all counts so triable.

## CERTIFICATE OF SERVICE

Pursuant to Rule 65(a), Fed.R.Civ.Pro., I hereby certify that a true and correct copy of this Application for Preliminary Injunction and Amended Complaint was served on Defendants' Registered Agents listed below this May 12, 2008, via the court's CM/ECF system and by U.S. Mail:

| | |
|---|---|
| Charles J. Grimsley, Esq. | NRAI Services, Inc. |
| General Counsel | 2731 Executive Park Dr. |
| United Automobile Insurance Group, Inc. | Suite 4 Weston, FL 33331 |
| 3909 N.E. 163rd St. Ste. 304 | |
| N. Miami Beach, FL 33160 | |
| **Agent for service of process for** | **Agent for service of process for Defendant,** |
| **Defendant, UAIG** | **CERIDIAN CORP.** |

J.B. Harris & Assoc., P.A.
By: **/s/ J.B. Harris**
J.B. HARRIS (FBN 495034)
2555 Ponce De Leon Blvd., Suite 320
Coral Gables, FL 33134
Ph:    305-444-6121
Fax:   305-444-5508
e-mail: jbharrisesq@hotmail.com